J-S50034-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HENRY B. RICHTER, | : | |
| | : | |
| Appellant. | : | No. 276 WDA 2018 |

Appeal from the PCRA Order, December 21, 2017,
in the Court of Common Pleas of Somerset County,
Criminal Division at No(s):  CP-56-CR-0000476-2013.

BEFORE:   BOWES, J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:          FILED NOVEMBER 26, 2018

Henry Richter appeals from the order denying his first petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541 – 9546 following his convictions of Aggravated Indecent Assault and Endangering the Welfare of Children.  We affirm the order denying Richter's post-conviction relief on the basis of the PCRA court's opinion.

The pertinent facts of this case as summarized by the PCRA court are as follows:

> On October 17, 2013, the District Attorney filed a Criminal Information charging [Richter] with Statutory Sexual Assault, Aggravated Indecent Assault (complainant less than sixteen years old), and Endangering the Welfare of Children. The charges arose out of reports that [Richter] had sexual relations with his fourteen year old niece, N.H., an instance of which was witnessed by one of [Richter's] sons on Father's Day, June 16, 2013.  Trial Tr. 1.40-43, Jan. 19, 2016.

On the date of the incident, [Richter's] minor son B.R. descended the stairs in the family residence and witnessed the victim, N.H., bent over with her pants down, and [Richter] standing directly behind her with his pants down, from which B.R. immediately concluded that the two were having sex. Id. at 1.113-17. N.H. was fourteen years of age at the time. Id. at 1.46, 1.85. B.R. ran upstairs and notified his brother through a series of messages on social media, and later the brothers notified police. Id. at 1.116, 1.79-80. An investigation was conducted which ultimately led to [Richter's] arrest. Id. at 1.40-58. [Richter] was initially represented by Attorney Brian Salisbury in the preliminary stages of the case, and on May 5, 2014, a request for a continuance was submitted to allow for additional plea negotiations and to allow [Richter] to find a new attorney. See Req. for Continuance, May 5, 2014. This Court granted that request, as well as additional continuance requests from both [Richter] and the Commonwealth, ultimately postponing the trial until January 19 and 20, 2016.

Trooper William Ted Goins was the criminal investigator for the Somerset County State Police who investigated the incident, and he testified on behalf of the Commonwealth at trial. Trial Tr. 1.38-59. Trooper Goins testified that on June 19, 2013, he received a report from a Children and Youth Services (hereafter "CYS") caseworker of potential sexual abuse involving a child, and subsequently travelled to Quecreek to interview [Richter]'s sons, B.R. and A.R. Id. at 1.40-43. During the interview of B.R., Trooper Goins was informed that on June 16, 2013, B.R. witnessed [Richter], his father, having sexual intercourse with N.H., [Richter's] fourteen year old niece. Id. at 1.43. As a result of the information obtained from B.R. and A.R., Trooper Goins determined he had probable cause to "certainly detain and probably arrest" [Richter] for crimes related to his conduct on June 16, 2013. Id. at 1.44. At that time, Trooper Goins decided to take [Richter] and N.H. separately to the police barracks for interviews. Id.

Trooper Goins testified that he first interviewed N.H with a representative from CYS present, and stated that at first, N.H. denied that she ever engaged in sexual intercourse with [Richter]. Id. at 1.48-50. However, eventually N.H. admitted to Trooper Goins that she had an ongoing

- 2 -

consensual sexual relationship with [Richter], and "described Henry as sweet and that she was in love with him." Id. at 1.50. [Richter] denied the allegations and stated to Trooper Goins that "[B.R.] did not see what he thought he saw," and requested an attorney. Id. at 1.50-51.

N.H. and B.R. both testified to the events on June 16, 2013 at trial. Id. at 1.84, 1.108. N.H. testified to the incident reported by B.R. that occurred on Father's Day 2013, as well as testified to an ongoing consensual sexual relationship with [Richter]. Id. at 1.90-92. When asked why she didn't report the relationship, N.H. stated that she "didn't feel that anybody needed to know," and when asked about her feelings regarding [Richter], N.H. stated "I felt good because somebody was actually paying attention to me and loving me." Id. at 1.90-91.

On cross-examination, counsel for [Richter] questioned N.H. about interviews taken by CYS, wherein N.H. was asked whether she had been abused by [Richter] or anyone else in the household. Id. at 1.95. In relation to those interviews, [Richter's] trial counsel, Attorney Gary Gerson, asked N.H., "And you repeatedly denied that you had been abused in any manner, particularly sexually, by Henry, correct?" to which N.H. admitted that she had denied ever being sexually abused by [Richter]. Id. Attorney Gerson also questioned N.H. about her prior allegations of sexual abuse against individuals other than [Richter], to which N.H. denied that those allegations were made in an attempt to get attention. Id. at 1.98. N.H. admitted that she had issues with bedwetting, and at the time of the incident she was a chronic bedwetter. Id. at 1.93.

N.H. also testified that while living in the residence, she often asked [Richter] for permission to do things, [Richter] set the rules of the house, and she was required to abide by and listen to [Richter] as well as her aunt, Bobbi-Jo ([Richter]'s fiancé), who also lived in the residence. Id. at 1.87. [Richter] admitted that he provided food, shelter and transportation for N.H., and that CYS had [Richter] listed as a caretaker for N.H., however [Richter] maintained that he was not a caretaker or provider for N.H. during the time period she lived in the residence. Id. at 2.30-32.

B.R., [Richter]'s son, described what he witnessed on June 16, 2013 at trial, stating, "I saw [N.H.] bent over with her pants down and my father inside of her, and whenever they saw me he pushed her away from him and they pulled up their pants . . . ." Id. at L113. B.R. further testified that he ran back upstairs after seeing his father and N.H. having sex, and then N.H. came upstairs and brought B.R. a handwritten note requesting that B.R. join her downstairs for breakfast. Id. at 1.117. When B.R. went downstairs, [Richter] was doing dishes and said, "I know what you saw isn't right and you shouldn't have saw it." Id. at 1.118.

On cross-examination, Attorney Gerson thoroughly questioned B.R. as to the amount of time that elapsed between him seeing [Richter] and N.H. in the kitchen and B.R. running back upstairs, as well as what exactly he saw and did not see. Id. at 1.120-26. Attorney Gerson also questioned B.R. at length regarding the conversation he had with his brother, A.R., that morning via Facebook messenger. Id. at 1.115-16, 1.122-29.

In addition to [Richter's] sons, the victim, and Trooper Goins, the Commonwealth provided forensic evidence and two scientific experts, Jennifer Badger, a serologist at the Pennsylvania State Police Crime Lab, and Dr. Alex Glessner, a forensic DNA scientist with the Pennsylvania State Police. Id. at 1.134-35, 1.148-49. Jennifer Badger testified to testing a blanket that was retrieved from [Richter's] residence, indicating that serological testing determined that there was semen on the blanket, and explained the procedure that was followed in collecting samples from the blanket and sending the samples for DNA testing. Id. at 1.139-45. Dr. Glessner explained the testing he performed on the samples, indicating that the DNA on the blanket matched that of both [Richter] and N.H. Id. at 1.151-62.

Before [Richter] testified, the [c]ourt explained [Richter's] right against self-incrimination, and questioned [Richter] on his understanding of his right not to testify, whether [Richter] had been adequately informed of the potential risks associated with testifying by Attorney Gerson, and generally whether [Richter] was making an informed, voluntary decision to waive his Fifth Amendment rights and testify on his own behalf. Id. at 2.1-2. [Richter]

indicated that he was adequately informed of his rights and intended to testify. Id.

In his testimony, [Richter] adamantly denied that he ever had sexual intercourse with N.H. Id. at 2.18-19, 2.20. [Richter] offered an alternative series of events, stating that his pants were never down, and N.H. pulled her pants down as a sort of practical joke, which was caught by B.R. at a moment where it may have looked like something was going on, even though [Richter] did not have his pants down and was not having intercourse with N.H. Id. at 2.16-20. [Richter] asserted that he told B.R. "What you saw isn't what you think you saw," and denied ever apologizing. Id. at 2.20. [Richter] denied all of the allegations by the District Attorney that he ever had sexual intercourse with N.H. Id. at 2.21-26. [Richter] also testified that he saw B.R. and N.H. in B.R.'s bedroom with B.R.'s pants down two days before Father's Day, and testified that his semen would only be found on the blanket as a result of sexual activities he had with his fiancé Bobbi-Jo, not N.H. Id. at 2.13-14, 2.30-31, 2.33-34. Further, [Richter] offered the explanation of N.H.'s DNA being present on the blanket as a result of her chronic bedwetting. Id.

On January 20, 2016, a jury found [Richter] guilty of Aggravated Indecent Assault and Endangering the Welfare of Children, but returned a not guilty verdict on the Statutory Sexual Assault charge. Trial Tr. 2.92-93. On April 18, 2016, [Richter] was sentenced by this [c]ourt.

PCRA Court Opinion, 12/22/17, 2-7.

The trial court sentenced Richter thirty-six months to one-hundred twenty months incarceration and a $500 fine for aggravated indecent assault, and was additionally sentenced to nine to eighteen months incarceration and a $100 fine for endangering the welfare of children. Richter filed a direct appeal from the judgment of sentence, arguing insufficient evidence existed to sustain either of the convictions. This Court affirmed the trial court on

December 6, 2016.  Commonwealth v. Richter, No. 755 WDA 2016 (Pa. Super. Ct. Dec. 6, 2016) (unpublished).

On April 17, 2017, Richter filed a Petition for Post-Conviction Relief, alleging ineffective assistance of counsel for Richter's three previous lawyers. The PCRA court held an evidentiary hearing on September 26, 2017.  By order entered December 21, 2017, the PCRA dismissed Richter's petition.  This timely appeal follows.  Both Richter and the PCRA court have complied with Pa.R.A.P. 1925.

Richter raises the following allegations of ineffective assistance of counsel:

1. Counsel Salisbury and Counsel Gerson were ineffective for failing to assert a conflict of interest objection against Assistant District Attorney Carolann Young on the basis that Young had previously represented [Richter] during child custody proceedings and further when Young participated in the instant case as an Assistant District Attorney.

2. Counsel Gerson was ineffective for failing to impeach the victim with the victim's own prior inconsistent statements and prior accusations that were offered in State Trooper Goins testimony.

3. Counsel Gerson was ineffective for failing to call [Richter's] fiancée, Bobbi Jo Harbaugh as a witness, as she was present in the house the morning of the alleged criminal act.

4. Counsel Calabrese failed to "perfect" [the direct appeal] from [Richter's] judgment of sentence because he failed to specify in the Pa.R.A.P. 1925(b) statement which elements of the offenses lacked sufficient evidence.

See Richter's Brief at 4.

- 6 -

Our scope and standard of review in a PCRA case is well settled:

> In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions de novo.

Commonwealth v. Reyes-Rodriguez, 111 A.3d 775, 779 (Pa. Super. 2015) (internal citations and quotations omitted).

To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish, by a preponderance of the evidence, that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate. Id. To succeed on a PCRA claim of ineffective assistance, a petitioner must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. Id. at 533.

Moreover, trial counsel's strategic decisions cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonably based and was not the result of sloth or ignorance of available alternatives. Commonwealth v. Collins, 545 A.2d 882, 886 (Pa. 1988) (cited with approval by Commonwealth v. Hall, 701 A.2d 190, 204 (Pa.

1997)). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." Commonwealth v. Ervin, 766 A.2d 859, 862-63 (Pa. Super. 2000) (quoting Commonwealth v. Miller, 431 A.2d 233, 234 (Pa. 1981). Our Supreme Court has defined "reasonableness" as follows:

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987) (quotation omitted). See also Commonwealth v. Clark, 626 A.2d 154, 157 (Pa. 1993) (explaining that a defendant asserting ineffectiveness based upon trial strategy must demonstrate that the "alternatives not chosen offered a potential for success substantially greater than the tactics utilized)." A defendant is not entitled to appellate relief simply because a chosen strategy was unsuccessful. Commonwealth v. Buksa, 655 A.2d 576, 582 (Pa. Super. 1995).

Finally, a finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. In assessing a claim of ineffectiveness, when it is clear that appellant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone,

without a determination of whether the first two prongs have been met. Commonwealth v. Travaglia, 661 A.2d 352, 357 (Pa. 1995).

After careful review, we conclude that the Honorable Scott P. Bittner prepared a thorough and well-reasoned opinion that correctly disposed of each of Richter's ineffectiveness claims. Judge Bittner discussed all three prongs of the ineffectiveness test to each of Richter's allegations. As to Richter's first claim, the PCRA court found no merit to the conflict of interest issue. The PCRA court combined Richter's next two claims and concluded that trial counsel's chosen strategy was reasonable, and the alternatives suggested by Richter did not offer "a potential for success substantially greater than the tactics utilized" by trial counsel. Clark, supra. As to Richter's final claim, Judge Bittner also concluded that he did not show how he was prejudiced by appellate counsel's alleged ineffectiveness since both the trial court and this Court evaluated Richter's direct appeal on its merits, despite counsel's failure to specifically address which elements of the two crimes were not sufficiently established.

We agree with the PCRA court's analysis and conclusions regarding all four issues Richter raised in his appeal. Therefore, we adopt Judge Bittner's December 22, 2017 opinion as our own in disposing of the present appeal. The parties are directed to attach a copy of the trial court opinion to this memorandum in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   11/26/2018

CLERK OF COURTS
SOMERSET, PA

COMMONWEALTH      2017 DEC 22   )   IIMTIN: TIR'P COURT OF COMMON PLEAS
                                                 )        OF SO:tvIBRSET COUNTY,

               v.         Fil.ED FOF; Rc.(CORD   ❓   PENNSYLVANIA

                                               )

                                               )        NO. 476CRIMINAL 2013

HENRY B. RICHTER                )

                                               )

                                               )

          Petitioner/Defendant.      )       POST-CONVICTION RELIEF

## MEMORANDUM

This matter comes before us on Petitioner/Defendant's Petition for Post-Conviction Collateral Relief, filed pursuant to the Post Conviction Relief Act, 42 Pa. Cons. Stat. §9541, *et seq.* (hereafter, the "PCRA"), wherein Defendant alleges ineffective assistance of counsel. Defendant's PCRA Petition, for the reasons set forth herein, is dismissed.

## PROCEDURAL HISTORY

On January 19 and 20, 2016, Henry B. Richter, (hereafter "Defendant") was tried before this Court, sitting with a jury, charged with Statutory Sexual Assault, a first-degree felony, Aggravated Indecent Assault', a second-degree felony, and Endangering the Welfare of Children', a first-degree misdemeanor. On January 20, 2016, the jury found Defendant guilty of Aggravated Indecent Assault and Endangering the Welfare of Children, but returned a not guilty verdict on the Statutory Sexual Assault charge. Trial Tr. 2.92–93. On April 18, 2016, by Order of this Court, Defendant was sentenced to thirty-six to one-hundred twenty months incarceration and a $500 fine for Aggravated Indecent Assault, and was additionally sentenced to nine to eighteen months incarceration and a $100 fine for Endangering the

---

[1] 18 Pa. Cons. Stat. § 3122.1 (b).
[2] 18 Pa. Cons. Stat. § 3125(a)(8) (with complainant less than 16 years of age).
[3] 18 Pa. Cons. Stat. § 4304(a)(1).

Welfare of Children. Sentencing Tr. 17–18 (Apr. 18, 2016).

Defendant filed a timely Notice of Appeal on May 17, 2016, and subsequently filed a Concise Statement of Matters Complained of on Appeal, pursuant to Pa. R.A.P. 1925(b), on June 8, 2016. On June 21, 2016, this Court filed its Opinion Pursuant to Pa. R.A.P. 1925(a). The Pennsylvania Superior Court subsequently affirmed the Defendant's conviction on the basis of the trial court's opinion and further affirmed the judgment of sentence on December 06, 2016. On May 15, 2017, Defendant filed a Petition pursuant to the PCRA accompanied by a Brief in Support of Defendant's PCRA Petition, requesting an evidentiary hearing pursuant to the Petition, the right to a new trial, and the reinstatement of Defendant's appeal rights. This Court granted the request for an evidentiary hearing on Defendant's PCRA Petition, which was held on September 26, 2017. At the conclusion of the evidentiary hearing, Defendant's PCRA Petition was taken under advisement.

## FACTUAL IDSTORY

On October 17, 2013, the District Attorney filed a Criminal Information charging Defendant with Statutory Sexual Assault, Aggravated Indecent Assault (complainant less than sixteen years old), and Endangering the Welfare of Children. The charges arose out of reports that Defendant had sexual relations with his fourteen year old niece, N.H., an instance of which was witnessed by one of Defendant's sons on Father's Day, June 16, 2013. Trial Tr. 1.40---43, Jan. 19, 2016.

On the date of the incident, Defendant's minor son B.R. descended the stairs in the family residence[4] and witnessed the victim, N.H., bent over with her pants down, and Defendant standing directly behind her with his pants down, from which B.R. immediately

---

[4] Defendant, his two sons B.R. and A.R., Bobbi-Jo Richter (N.H.'s aunt and Defendant's fiance), Bobbi-Jo and Defendant's infant M.R., and N.H. all lived in Defendant's residence when the incident occurred. Trial Tr. 2.31–32.

2

concluded that the two were having sex. *Id.* at 1.113–17. N.H. was fourteen years of age at the time. *Id.* at 1.46, 1.85. B.R. ran upstairs and notified his brother through a series of messages on social media, and later the brothers notified police. *Id.* at 1.116, 1.79–80. An investigation was conducted which ultimately led to Defendant's arrest. *Id.* at 1.40–58. Defendant was initially represented by Attorney Brian Salisbury in the preliminary stages of the case, and on May 5, 2014, a request for a continuance was submitted to allow for additional plea negotiations and to allow Defendant to find a new attorney. *See* Req. for Continuance, May 5, 2014. This Court granted that request, as well as additional continuance requests from both Defendant and the Commonwealth, ultimately postponing the trial until January 19 and 20, 2016.

Trooper William Ted Goins was the criminal investigator for the Somerset County State Police who investigated the incident, and he testified on behalf of the Commonwealth at trial. Trial Tr. 1.38–59. Trooper Goins testified that on June 19, 2013, he received a report from a Children and Youth Services (hereafter "CYS") caseworker of potential sexual abuse involving a child, and subsequently travelled to Quecreek to interview Defendant's sons, B.R. and A.R. *Id.* at 1.40-43. During the interview of B.R., Trooper Goins was informed that on June 16, 2013, B.R. witnessed Defendant, his father, having sexual intercourse with N.H., Defendant's fourteen year old niece. *Id.* at 1.43. As a result of the information obtained from B.R. and A.R., Trooper Goins determined he had probable cause to "certainly detain and probably arrest" Defendant for crimes related to his conduct on June 16, 2013. *Id.* at 1.44. At that time, Trooper Goins decided to take Defendant and N.H. separately to the police barracks for interviews. *Id.*

Trooper Goins testified that he first interviewed N.H with a representative from CYS

3

present, and stated that at first, N.H. denied that she ever engaged in sexual intercourse with Defendant. *Id.* at 1.48–50. However, eventually N.H. admitted to Trooper Goins that she had an ongoing consensual sexual relationship with Defendant, and "described Henry as sweet and that she was in love with him." *Id.* at 1.50. Defendant denied the allegations and stated to Trooper Goins that "[B.R.] did not see what he thought he saw," and requested an attorney. *Id.* at 1.50–51.

N.H. and B.R. both testified to the events on June 16, 2013 at trial. *Id.* at 1.84, 1.108. N.H. testified to the incident reported by B.R. that occurred on Father's Day 2013, as well as testified to an ongoing consensual sexual relationship with Defendant. *Id.* at 1.90–92. When asked why she didn't report the relationship, N.H. stated that she "didn't feel that anybody needed to know," and when asked about her feelings regarding Defendant, N.H. stated "I felt good because somebody was actually paying attention to me and loving me." *Id.* at 1.90–91.

On cross-examination, counsel for Defendant questioned N.H. about interviews taken by CYS, wherein N.H. was asked whether she had been abused by Defendant or anyone else in the household. *Id.* at 1.95. In relation to those interviews, Defendant's trial counsel, Attorney Gary Gerson, asked N.H., "And you repeatedly denied that you had been abused in any manner, particularly sexually, by Henry, correct?" to which N.H. admitted that she had denied ever being sexually abused by Defendant. *Id.* Attorney Gerson also questioned N.H. about her prior allegations of sexual abuse against individuals other than Defendant, to which N.H. denied that those allegations were made in an attempt to get attention. *Id.* at 1.98. N.H. admitted that she had issues with bedwetting, and at the time of the incident she was a chronic bedwetter. *Id.* at 1.93.

N.H. also testified that while living in the residence, she often asked Defendant for

4

permission to do things, Defendant set the rules of the house, and she was required to abide by and listen to Defendant as well as her aunt, Bobbi-Jo (Defendant's fiancé), who also lived in the residence. *Id.* at 1.87. Defendant admitted that he provided food, shelter and transportation for N.H., and that CYS had Defendant listed as a caretaker for N.H., however Defendant maintained that he was not a caretaker or provider for N.H. during the time period she lived in the residence. *Id.* at 2.30–32.

B.R., Defendant's son, described what he witnessed on June 16, 2013 at trial, stating, "I saw [N.H.] bent over with her pants down and my father inside of her, and whenever they saw me he pushed her away from him and they pulled up their pants . . . ." *Id.* at 1 J 13. B.R. further testified that he ran back upstairs after seeing his father and N.H. having sex, and then N.H. came upstairs and brought B.R. a handwritten note requesting that B.R. join her downstairs for breakfast. *Id.* at 1.117. When B.R. went downstairs, Defendant was doing dishes and said, "I know what you saw isn't right and you shouldn't have saw it." *Id* at 1.118.

On cross-examination, Attorney Gerson thoroughly questioned B.R. as to the amount of time that elapsed between him seeing Defendant and N.H. in the kitchen and B.R. running back upstairs, as well as what exactly he saw and did not see. *Id.* at 1.120–26. Attorney Gerson also questioned B.R. at length regarding the conversation he had with his brother, A.R., that morning via Facebook messenger. *Id.* at 1.115–16, 1.122–29.

In addition to Defendant's sons, the victim, and Trooper Goins, the Commonwealth provided forensic evidence and two scientific experts, Jennifer Badger, a serologist at the Pennsylvania State Police Crime Lab, and Dr. Alex Glessner, a forensic DNA scientist with the Pennsylvania State Police. *Id.* at 1.134–35, 1.148-49. Jennifer Badger testified to testing

5

a blanket that was retrieved from Defendant's residence, indicating that serological testing determined that there was semen on the blanket, and explained the procedure that was followed in collecting samples from the blanket and sending the samples for DNA testing. *Id.* at 1.139-45. Dr. Glessner explained the testing he performed on the samples, indicating that the DNA on the blanket matched that of both Defendant and N.H. *Id.* at 1.151-62.

Before Defendant testified, the Court explained Defendant's right against self-incrimination, and questioned Defendant on his understanding of his right not to testify, whether Defendant had been adequately informed of the potential risks associated with testifying by Attorney Gerson, and generally whether Defendant was making an informed, voluntary decision to waive his Fifth Amendment rights and testify on his own behalf. *Id.* at 2.1-2. Defendant indicated that he was adequately informed of his rights and intended to testify. *Id.*

In his testimony, Defendant adamantly denied that he ever had sexual intercourse with N.H. *Id.* at 2.18-19, 2.20. Defendant offered an alternative series of events, stating that his pants were never down, and N.H. pulled her pants down as a sort of practical joke, which was caught by B.R. at a moment where it may have looked like something was going on, even though Defendant did not have his pants down and was not having intercourse with N.H. *Id* at 2.16-20. Defendant asserted that he told B.R. "What you saw isn't what you think you saw," and denied ever apologizing. *Id.* at 2.20. Defendant denied all of the allegations by the District Attorney that he ever had sexual intercourse with N.H. *Id* at 2.21-26. Defendant also testified that he saw B.R. and N.H. in B.R.'s bedroom with B.R.'s pants down two days before Father's Day, and testified that his semen would only be found on the blanket as a result of sexual activities he had with his fiance' Bobbi-Jo, not N.H. *Id.* at 2.13-14, 2.30-31,

6

2.33–34. Further, Defendant offered the explanation of N.H.'s DNA being present on the blanket as a result of her chronic bedwetting. *Id.*

On January 20, 2016, a jury found Defendant guilty of Aggravated Indecent Assault and Endangering the Welfare of Children, but returned a not guilty verdict on the Statutory Sexual Assault charge. Trial Tr. 2.92–93. On April 18, 2016, Defendant was sentenced by this Court. Subsequent to sentencing, Defendant selected new counsel, Attorney Tancredi Calabrese, who filed a timely Notice of Appeal on May 17, 2016. On June 8, 2016, Attorney Calabrese filed a Concise Statement of Matters Complained of on Appeal, pursuant to Pa. R.A.P. 1925(b), as requested by the Order of this Court on May 19, 2017. The sole issue raised in the Defendant's Concise Statement of Matters Complained of on Appeal was whether the evidence at trial was sufficient to establish that Defendant committed Aggravated Indecent Assault and Endangering the Welfare of Children.

On June 21, 2016, this Court issued an Opinion Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), wherein we reasoned that Defendant was properly convicted of Aggravated Indecent Assault and Endangering the Welfare of Children. *See* Op. Pursuant to Pa. R.A.P. 1925(a), June 21, 2016. It was also acknowledged that Defendant's Concise Statement of Matters Complained of on Appeal did not allege with specificity what elements of either offense were not sufficiently established by the evidence offered at trial. *Id.* Pennsylvania Rule of Appellate Procedure 1925(b)(4)(ii) provides, "The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge . . . ." Further, based on Rule 1925(b)(4)(vii), "Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."

7

Although Defendant's Concise Statement of Matters Complained of on Appeal was not specific as to which elements weren't sufficiently established, this Court nevertheless analyzed and reviewed the evidence proffered at trial with respect to each and every element of Aggravated Indecent Assault and Endangering the Welfare of Children, and determined that there was sufficient evidence presented at trial to support Defendant's conviction on each charge. Op. Pursuant to Pa. R.A.P. 1925.(a), June 21, 2016. On December 6, 2016, the Pennsylvania Superior Court affirmed the decision of this Court, and likewise concluded that Defendant's appeal was without merit. *Commonwealth v. Richter*, No. 755 WDA 2016 (Pa. Super. Ct. Dec. 2, 2016).

Following the denial of Defendant's direct appeal, a Praecipe for Entry of Appearance was filed by Attorney Joseph Luvara on April 17, 2017. Attorney Luvara submitted a Petition for Post-Conviction Relief and Brief in Support of Defendant's PCRA Petition on May 15, 2017. Defendant's PCRA Petition alleges ineffective assistance of counsel, with respect to each of Defendant's former counsel, namely Attorney Salisbury, Attorney Gerson and Attorney Calabrese. An evidentiary hearing was held on September 26, 2017, and Defendant's ineffective assistance of counsel claims are discussed *infra*.

### ANALYSIS

When ineffective assistance of counsel is alleged, a petitioner must prove that his conviction or sentence resulted from "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. Cons. Stat. § 9543(2)(ii). A claim of ineffective assistance of counsel requires the petitioner to satisfy the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

8

*Strickland* is a two-part test: "First, the defendant must show that counsel's performance was deficient," which requires demonstrating "that counsel made errors so serious that the counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, "the defendant must show that the deficient performance prejudiced the defense," which requires "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In Pennsylvania, the *Strickland* test has three distinct elements:

> The petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

*Commonwealth v. Weiss,* 81 A.3d 767, 782 (Pa. 2013) (citing *Commonwealth v. Pierce,* 527 A.2d 973, 975 (Pa. 1987)). The Pennsylvania Supreme Court has stated that "both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first." *Id.* at 783 (internal citations omitted).

Defendant claims counsel was ineffective at each stage of his prosecution and through the appeal process, particularly: 1) Attorney Salisbury was ineffective for failing to raise a conflict of interest objection against the District Attorney's office due to Assistant District Attorney Carolann Young's prior representation of Defendant in a custody matter in 2005; 2) Attorney Gerson was ineffective for: failing to raise a conflict of interest objection against Assistant District Attorney Carolann Young, as described above; failing to impeach the victim with prior inconsistent statements and prior accusations; and failing to call a key

9

witness; and 3) Attorney Calabrese was ineffective for "failing to perfect" Defendant's appeal in accordance with Pa. R.A.P. 1925(b).

I.     <u>Neither Attorney Salisbury, nor Attorney Gerson, Was Ineffective for Failing to Raise a Conflict of Interest Objection Against the Office of the Somerset County District Attorney or Assistant District Attorney Carolann Young</u>.

Defendant claims that Attorney Salisbury and Attorney Gerson were ineffective for failing to raise an objection to an alleged conflict of interest of Assistant District Attorney Carolann Young, who had previously represented the Defendant in a custody matter involving his ex-wife in 2005. The evidence indicates that Attorney Young did not participate in the criminal investigation, strategy or prosecution of Defendant. Defendant alleges that the failure of counsel to object to the alleged conflict was unreasonable and prejudiced him at trial, and therefore warrants relief under the PCRA. We disagree.

Rule 1.9 of the Pennsylvania Rules of Professional Conduct concerns "Duties to Former Clients," and provides that "a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." Pa. R.P.C. 1.9. The explanatory comments to Rule 1.9 explain that "matters are 'substantially related' for purposes of this Rule if they involve the *same transaction or legal dispute* or if there otherwise is a *substantial risk* that confidential factual information as would normally have been obtained in the prior representation *would materially advance* the client's position in the subsequent matter." Pa. R.P.C. 1.9, cmt. 3 (emphasis added).

The fact that the two representations involve similar or related facts is likely not

10

sufficient to warrant the finding of a substantial relationship to disqualify an attorney. *Commonwealth Ins. Co. v. Graphix Hot Line,* 808 F. Supp. 1200, 1204 (E.D. Pa. 1992). The relevant inquiry is whether information acquired by an attorney in his or her former representation is substantially related to the subject matter of the subsequent representation. *Id* If an attorney might have acquired confidential information related to the subsequent representation, Pennsylvania Rule of Professional Conduct 1.9 prevents the attorney from representing the second client. *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382, 1385 (3d Cir. 1972). Furthermore, a former client seeking to disqualify counsel representing an adverse party on the basis of its past relationship has the burden of proving: (1) that a past attorney/client relationship existed which was adverse to a subsequent representation of the other client; (2) that the subject matter of the relationship is substantially related; and (3) that the allegedly conflicted attorney acquired knowledge of confidential information from or concerning the former client. *In re Estate of Pew,* 655 A.2d 521, 545-46 (Pa. Super. Ct. 1994).

In order to prevail under the PCRA, Defendant must demonstrate that the underlying claim has arguable merit. *Weiss,* 81 A.3d at 782. Based on Pennsylvania Rule of Professional Conduct 1.9, as well as Pennsylvania case law interpreting the Rule, there was no conflict requiring the disqualification of the Somerset County District Attorney's office, and therefore, Defendant's claim that counsel was ineffective for failing to raise a conflict of interest objection does not have arguable merit.

While Attorney Carolann Young did in fact represent Defendant in a custody matter in 2005 and was an Assistant District Attorney at the time of Defendant's criminal trial in 2016, Attorney Young did not participate in the criminal prosecution of Defendant. At the

11

PCRA hearing, Attorney Young testified that she was not involved in Defendant's criminal trial, and no evidence was presented to indicate that Attorney Young had anything to do with the District Attorney's investigation., preparation or prosecution of Defendant's criminal case. *See* PCRA Hr'g Tr. 21–22. Since Attorney Young was not involved in Defendant's criminal prosecution, there was no conflict of interest with respect to the Somerset County District Attorney's office.

Additionally, Defendant's custody proceeding and criminal case are not the same or substantially related matters, which is another requirement for disqualification under Rule 1.9. Attorney Young represented Defendant during a custody dispute involving Defendant and his ex-wife in 2005, whereas Defendant's criminal prosecution concerned events that occurred from approximately September 2012 through June 16, 2013. Since all relevant events leading to Defendant's arrest and prosecution did not occur until long after Attorney Young's representation in the custody proceeding concluded, Defendant could not have disclosed any relevant facts or confidences to Attorney Young related to those future events[6]. Further, nothing related to Defendant's divorce in 2005 or the custody of his sons was at issue, discussed, or relevant to the criminal investigation and prosecution of Defendant. The only connection between the two matters is the involvement of Defendant and his two sons.

[5] Attorney Young signed off on an Application for Search Warrant presented to the Somerset County District Attorney's office by Trooper Goins on June 21, 2013, in accordance with Pa. R. Crim. P. 2002a. However, this action by Attorney Young was merely an administrative task in which she represented to the Issuing Authority that there was probable cause to issue the warrant. Attorney Young did not assist as the on-call Assistant District Attorney on-site during the execution of the warrant, and none of the information included on the search warrant was related, in any way, to Attorney Young's prior representation of Defendant. Attorney Young did not provide any information, at any time, about Defendant to the Somerset District Attorney's office or to the Pennsylvania State Police. Additionally, the District Justice made an independent determination based on the information provided by Trooper Goins that there was sufficient probable cause to support the issuance of a search warrant. The mere signing off on the search warrant by Attorney Young to indicate the approval of the search warrant application by the District Attorney's office does not represent involvement in Defendant's prosecution and is not substantially related to Attorney Young's prior representation of Defendant.

[6] There is nothing in the record to suggest that Attorney Young obtained any confidential information in the course of her prior representation of Defendant that was or could have been utilized by the Pennsylvania State Police or the Somerset County District Attorney's office.

This does not establish a substantial relationship, as the two matters did not arise from the same facts or even related events, and the subsequent matter occurred long after the prior representation by Attorney Young had ended.

Even if there were concerns about a potential conflict of interest, both Attorney Young and Attorney Gerson testified that during a prior Call of the Criminal Trial List or Scheduling Conference Attorney Young was present in the courtroom concerning an unrelated matter, and she disclosed to Attorney Gerson and the Court that she had previously represented Defendant in a domestic matter. PCRA Hr'g Tr. 27. Attorney Gerson testified that he wrote Defendant a letter[7] and discussed Attorney Young's prior representation of Defendant and her position as an Assistant District Attorney. *Id.* at 58–60. Thereafter, the next time that Attorney Gerson and Defendant spoke, they again discussed the potential conflict of interest issue related to Attorney Young. *Id.* Attorney Gerson's recollection was that Defendant dismissed him when the issue with Attorney Young was discussed and Defendant indicated that this was not an issue, and that Defendant was ready to proceed to trial. *Id.* at 59–60.

Defendant's claim that counsel was ineffective for failing to raise a conflict of interest objection does not have arguable merit. Although Attorney Young and Defendant had a prior attorney/client relationship, and Attorney Young was an Assistant District Attorney at the time Defendant was prosecuted, Attorney Young did not participate in the prosecution of Defendant, and the two matters are not the same or substantially related. Since no conflict of

---

[7] During the Evidentiary Hearing on this matter, counsel for Defendant subpoenaed Attorney Gerson who testified to various letters written to Defendant during the course of his representation. Attorney Gerson testified that one of the letters specifically discussed the potential conflict of interest with the Somerset County District Attorney's office, based on Attorney Young's disclosure that she had previously represented Defendant in an unrelated custody matter. Attorney Gerson testified to what the contents of the various letters were from the witness stand and used the letters to refresh his memory. Counsel for Defendant objected to the admission of the letters as documentary evidence, and therefore, Attorney Gerson's uncontradicted testimony is the only evidence in the record with respect to Attorney Gerson's letters to Defendant. *See* PCRA Hr'g Tr. 68,-73.

13

interest existed, counsel was not ineffective for failing to object to the prosecution of Defendant by the Somerset County District Attorney's office. Attorney Carolann Young did not provide information or strategy to the District Attorney, nor did she participate in Defendant's prosecution in any way. Therefore, Defendant's claim of ineffective assistance of Attorney Salisbury[8] and Attorney Gerson with respect to the alleged conflict of Assistant District Attorney Carolann Young is dismissed.

II.    Defendant Has Failed to Demonstrate that Attorney Gerson Was Ineffective for Failing to Call a Key Witness and Failing to Impeach the Victim with Prior Inconsistent Statements and Prior Accusations.

Defendant argues that Attorney Gerson's trial strategy fell below the objective standard of reasonableness, and thus deprived him of the right to counsel guaranteed by the Sixth Amendment, for two reasons: 1) Attorney Gerson failed to call a key witness, Bobbi Jo Harbaugh, Defendant's fiancé; and 2) Attorney Gerson failed to impeach the victim with her prior inconsistent statements and prior accusations.

*Strickland* itself makes clear that "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 687–88. *Strickland* emphasizes that some deference must be afforded to the reasonable trial strategy of counsel, explaining:

---

[8] While Defendant's PCRA Petition claims that both Attorney Salisbury and Attorney Gerson were ineffective for failing to raise a conflict of interest objection, the evidence indicates that the potential issue disclosed by Attorney Young was not even discovered until after Attorney Salisbury's representation of Defendant had ended, and therefore Attorney Salisbury would have been unaware of the potential issue and could not have raised it. At the PCRA hearing, Defendant did not provide any evidence of Attorney Salisbury's allegedly ineffective representation, in any regard, and therefore, the claim for ineffective assistance with respect to Attorney Salisbury is dismissed.

> Judicial scrutiny of counsel's performance must be highly deferential . . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689 (internal quotations and citations omitted); *see also Thomas v. Varner,* 428 F.3d 491, 499 (3d Cir. 2005).

The Pennsylvania Supreme Court stated, "where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interest." *Commonwealth v. Howard,* 719 A.2d 233, 237 (Pa. 1998). A claim of ineffective assistance generally cannot "succeed through comparing, by hindsight, the trial strategy employed with alternatives not pursued." *Id.* Furthermore, a "finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.*

### a. *Ineffectiveness for Failing to Call a Key Witness*

Defendant alleges Attorney Gerson was ineffective for failing to call Bobbi Jo Harbaugh (hereafter "Bobbi Jo"), Defendant's fiancé and the victim's Aunt, as a defense witness at trial. However, Attorney Gerson's decision not to call Bobbi Jo as a witness had a reasonable basis designed to advance the interests of Defendant, and therefore does not fall below the standard of reasonableness.

At the PCRA Hearing, Bobbi Jo gave conflicting testimony as to whether her possibility of testifying as a witness was discussed or not. On direct examination, PCRA counsel inquired:

15

Q: Did you have a discussion with Mr. Gerson with regard to testifying at [Defendant's] trial?

A: No, he never brought that to my attention.

Q: He never brought it up?

A: No, sir.

Q: You never brought it up to him?

A: No.

Q: Was there any discussion with Henry with regard – with you about testifying at trial?

A: Not that I recall.

Q: There was no discussion with regard to possibly being a witness with regard to his character, what type of person he was?

A: Um, *he had suggested it once* and never brought it back up after that.

Q: Did you hear Mr. Gerson testify today?

A: Yes.

Q: Did Mr. Gerson – is it your understanding that Mr. Gerson was speaking correctly when he said that you said you would not testify?

A: Not that I recall. He never brought it to my attention for me to be able to testify for Henry at the time.

PCRA Hr'g Tr. 80–81. Just a few minutes later, Bobbi Jo seemingly contradicts herself:

16

Q: Would you have been prepared to testify to Henry's character for not being a violent man?

A: Yes.

Q: It was never discussed with Mr. Gerson that you could testify to that matter?

A: No. It was not.

Q: Did you have a concern about your background in the matters of CYS back in 2001 that would cause you to be compromised in testifying in this case for Henry?

A: Yes.

Q: You had a problem with that?

A: I had a problem with it because I was currently in CYS, and some of the stuff that came to questioning, I had a problem with, *that I had to address with Gerson.*

Q: And you discussed that with him?

A: Yes.

*Id.* at 85.

Bobbi Jo first testified that she never had any discussion with Attorney Gerson or Defendant about her testifying at Defendant's trial, then subsequently admitted there were concerns about testifying that she discussed with Attorney Gerson with respect to her involvement with CYS. PCRA Hr'g Tr. 80–85. Any CYS concerns that were unrelated to the incident in question would only be relevant to Attorney Gerson in the event that Bobbi Jo would be called to the witness stand to testify.

17

Additionally, Attorney Gerson testified that there were discussions about whether or not Bobbi Jo would testify, and Bobbi Jo clearly refused.to testify or get involved. *Id.* at 52. Attorney Gerson also testified that prior to trial, he sent Defendant a letter identifying the likely witnesses, including Bobbi Jo. *Id.* at 70. The letter[9] allegedly indicated what Bobbi Jo would potentially testify to at trial. *Id.* Attorney Gerson's testimony contradicts Bobbi Jo's testimony, and we found Bobbi Jo's testimony to be inconsistent and subject to credibility concerns.

Attorney Gerson also testified to potential concerns about putting Bobbi Jo on the witness stand, including: 1) Bobbi Jo previously gave conflicting reports about where N.H. was sleeping in the house; 2) According to the CYS reports, Bobbi Jo had ran away with Defendant when she was fifteen years of age which resulted in her placement within CYS custody[10]; 3) The CYS reports indicated that Mr. Richter's brother, Clarence, was in prison for sexually abusing N.H.; and 4) The CYS reports also indicated that Bobbi Jo's maternal grandfather was convicted for sexually molesting her. *Id.* at 55–56. Attorney Gerson had reasonable concerns about offering Bobbi Jo as a witness, but further testified that Bobbi Jo flat out refused to testify, which was allegedly documented in the letters written to Defendant. *Id.*

Additionally, it should be noted that on the date of the incident, Bobbi Jo was upstairs sleeping and was not a witness to the events in question. Trial Tr. 1.89. Therefore, Bobbi Jo would not have been able to testify as to what B.R. saw, and as acknowledged in Defendant's Brief in Support of the PCRA Petition, Bobbi Jo would only have had personal knowledge of

---

[9] As mentioned *supra,* the specific contents of the letters are unknown as counsel for Defendant objected to the introduction into evidence of the letters at the PCRA Hearing. *See* PCRA Hr'g Tr. 68–73.

[10] Attorney Gerson testified that he found this fact to be troubling because he thought it "sounded sort of familiar" (to the facts in this case), and he interpreted the CYS records to suggest that Defendant had been grooming Bobbi Jo when she was fifteen years old to run away with him. PCRA Hr'g Tr. 55–56.

18

the "demeanors" of Defendant, his sons and the victim on the date in question. *See* Br. Supp. Def.'s PCRA Pet. 13–14. While Defendant also alleges Bobbi Jo could have testified that she was the sole caregiver to N.H. during this time, the testimony of both Defendant and N.H. and the form from CYS demonstrate that Defendant was a caregiver to N.H.[11]

Based on the testimony of Attorney Gerson and Bobbi Jo, as well as the factual circumstances surrounding the available testimony of Bobbi Jo and her susceptibility to potentially damaging impeachment on the witness stand, it was not unreasonable for Attorney Gerson to not call Bobbi Jo as a witness at Defendant's trial. Bobbi Jo refused to testify or get involved, had already given conflicting reports to authorities, the history of her involvement with Defendant at a young age was potentially problematic, and she was perceived as contradictory and not credible at the PCRA hearing. Further, Bobbi Jo was unable to provide any new or novel facts at trial since she did not witness the event in question. Therefore, the fact that Bobbi Jo did not testify at trial is not sufficiently unreasonable for this Court to determine that if she had testified there is any likelihood that the result at trial would have been different. In fact, due to the various issues surrounding Bobbi Jo, and the potential for damaging information to come to light as a result of her testimony, the decision not to put her on the stand was a reasonable trial strategy. Defendant has not demonstrated that had Bobbi Jo been offered as a witness, there was a substantially greater probability of a successful defense, and therefore this claim fails.

---

[11] The District Attorney questioned Defendant regarding whether he was a caretaker for N.H., and he denied acting in a caretaker role, stating "I just provided meals for her, a place to live." Trial Tr. 2.31. The District Attorney also asked why Defendant's name was listed as a "caretaker" for N.H. on a CYS form, to which Defendant replied, "I guess that's what we were." Additionally, B.R. testified that Defendant was the head of the household, that he didn't consider Bobbi Jo his stepmother and didn't refer to her as "mom" or "stepmom", and that he had to answer to Defendant in the household. *Id.* at 1.112. B.R. also testified that N.H. called Defendant "Uncle Henry" and mostly called Bobbi Jo "Bobbi", as opposed to "Aunt Bobbi." *Id.* While Bobbi Jo could have offered her testimony that she was the sole caregiver to N.H., that testimony would have been contradictory to the majority of the testimony provided at trial as well as the CYS documentation that indicated that Defendant was a caregiver to N.H. during the time in question.

19

b.   *Ineffectiveness for Failing to Impeach the Victim With Prior Inconsistent Statements*

*and Prior Accusations*

Defendant also alleges that Attorney Gerson was ineffective for failing to impeach N.H. with her prior inconsistent statements when she was on the witness stand, and that unreasonable error of counsel prejudiced Defendant at trial. On direct examination, N.H. testified to having sexual intercourse with Defendant, and largely corroborated the testimony of B.R., Defendant's son who reported the incident. Trial Tr. 1.84–92. On cross examination, Attorney Gerson questioned N.H. about her bedwetting and about how N.H.'s life significantly improved while living in the Richter household. *Id.* at 1.93–94. N.H. admitted to chronic bedwetting, and agreed with Attorney Gerson that many aspects of her life improved when she moved in with Defendant and Bobbi Jo. *Id*

Attorney Gerson even asked N.H. on cross-examination about her prior denial of any sexual contact between her and Defendant:

> Q:   And in fact back on, I think it was June 19th of 2013, the day that Henry was arrested, you had actually been taken to Child Protective Services because of allegations m another matter, correct, against Henry Richter?
>
> A:   Yes.
>
> Q:   And you were asked throughout those interviews whether you had ever been abused by Henry or anyone else in that household; correct?
>
> A:   Yes.
>
> Q:   And you repeatedly denied that you had been abused in

any manner, particularly sexually, by Henry; correct?

A: Yes.

Trial Tr. 1.96. Attorney Gerson questioned N.H. about a variety of inconsistencies in her story, including whether she told Trooper Goins that her and Defendant used condoms when they were having sex:

Q: Now, you also told Trooper Goins, this gentlemen sitting next to me here, that you had used condoms when you had sex with him; is that correct?

A: I don't remember saying that.

Q: Are you saying you don't remember or that you didn't say it?

A: I don't remember.

Q: At any rate, would you agree with me that you felt comfortable living in the Richter household with all the people who were living there?

A: Yes.

*Id.* at 1.96–97.

Additionally, other witnesses also testified that N.H. had originally denied any sexual contact between her and Defendant, including Trooper Goins. *Id.* at 1.49–50. Trooper Goins testified to his knowledge of other accusations made by N.H. against individuals other than Defendant. *Id* at 1.64-65. B.R. agreed with Attorney Gerson that N.H. was a "practical joker," and that N.H. was known to play jokes on people and act out. *Id* at 1.120. Defendant himself offered testimony that N.H. was a "practical joker," and indicated that this incident

21

would have been one of her "jokes." *Id.* at 2.18. Defendant also testified on cross-examination that N.H. was lying, and that N.H. sometimes flirted with him. *Id.* at 2.34-40.

Throughout the trial, there were references to N.H.'s various other accusations of sexual assault against individuals other than Defendant and testimony about her troubled past. On direct examination, the District Attorney asked N.H., "[T]here's been some discussion before you came in the courtroom about you making reports about other sexual assaults. Is that true?" to which N.H., responded "Yes." *Id.* at 1.92. However, N.H. had no explanation for why she did not report her sexual relationship with Defendant to authorities. *Id.* On cross-examination, Attorney Gerson asked N.H., "The allegations you made against the other four individuals were made in an attempt to get attention drawn to yourself; were they not?" to which N.H. responded, "No." *Id.* at 1.98. Immediately afterwards, the District Attorney again brought up the prior allegations, discussing the prior instances where N.H. had reported sexual abuse, starting with when she was eight years old. *Id.* at 1.99. During that line of questioning, N.H. agreed with the District Attorney's questions, asserting that Defendant never forced her to have sex with him, and that if B.R. had never came downstairs that morning, she would not have reported the relationship or told police. *Id*

In addition to the discussion of the prior allegations within N.H.'s own testimony, at the very beginning of trial, Trooper Goins testified to having knowledge of N.H.'s prior accusations. *Id* at 1.64. Attorney Gerson questioned Trooper Goins on cross-examination as to whether he was aware of prior accusations of sexual abuse reported by N.H.:

> Q: As the lead investigator, you've referred to the fact that
>
> [N.H.] had – did have Child Protective Services or
>
> something like that, for previous reasons, that you were

22

aware of?

A:   That I was aware of; yes, sir.

Q:   Other investigations; correct?

A:   Yes, sir.

Q:   And you were aware of what those other investigations were, the subject matter of those other investigations?

A:   To be honest, sir, unless it dealt with me, no, I was not.

Q:   Okay. Were you aware, sir, that she had made allegations against four other individuals of being sexually assaulted from the age of 8 to the age of 14?

A:   Yes, sir; I believe I would be aware of that.

Q:   You were aware that she was, she claimed to be raped at the age of 8 by a man by the name of John King?

A:   I handled that case.

Q:   I'm sorry?

A:   I handled that case.

Q:   Jeffrey Dean?

A:   The name is familiar from [N.H.] during her interview.

Q:   Also an individual by the name of Clarence Richter?

A:   Yes.

*Id.* at 1.64-65. Additionally, there was discussion of N.H.'s prior accusations during Defendant's own testimony on both direct and cross examination. *Id.* at 2.9–10; 2.26.

In his closing argument, Attorney Gerson pointed out the inconsistencies of N.H.'s

23

testimony, and suggested that N.H. was not credible. *Id* at 2.45. Attorney Gerson again pointed out that N.H. made four prior accusations of rape against other individuals by the age of fourteen, that she denied any sexual or physical abuse by Defendant to Child Protective Services, that she changed her story to Trooper Goins, and he further stated:

> Attorney Gerson: Which lie are we going to believe, ladies and gentlemen? That's for you to make a determination on. This child is a liar. She's young. She's troubled. And I would suggest to you that her testimony should be looked at with a lot of suspicion and doubt.

Trial Tr. 2.47.

Pursuant to *Strickland,* Defendant must show that counsel's representation fell below an objective standard of reasonableness. 466 U.S. at 687–88. As explained *supra,* a claim of ineffective assistance cannot succeed through comparing the trial strategy employed with alternatives not pursued, and Defendant must demonstrate that the alternative not chosen offered substantially greater potential for success. *Commonwealth v. Howard,* 719 A.2d 233, 237 (Pa. 1998). In the instant case, Defendant has failed to demonstrate that Attorney Gerson's representation fell below the standard of reasonableness. Additionally, Defendant had not established that any further questioning of N.H. regarding her inconsistent statements or prior accusations would have substantially increased Defendant's likelihood of a successful defense.

While Defendant argues that Attorney Gerson failed to cross-examine N.H. regarding her inconsistent statements, the record reflects otherwise. Trial Tr. 1.96–97. Perhaps Attorney

24

Gerson could have been more aggressive in his questioning of N.H., however, that strategy could present its own concerns, including appearing argumentative or overbearing with a young, fragile victim. Regardless, it is indisputable that the fact that N.H. had changed her story, previously accused others of sexual abuse, and was subject to concerns about her credibility was clearly placed before the jury. Further, Defendant's assertion that Attorney Gerson could have been more effective in his cross-examination of N.H. does not indicate that Attorney Gerson's representation fell below the standard of objective reasonableness, nor has Defendant proven that some alternative strategy in the questioning of N.H. would have substantially improved Defendant's likelihood of a successful defense. As a result, Defendant's claim that Attorney Gerson's representation was ineffective fails and is dismissed.

III. Attorney Calabrese's Failure to Specify the Elements Not Sufficiently Supported by Evidence at Trial on Appeal Did Not Prevent the Court from Considering the Merits of Defendant's Appeal and No Prejudice Has Been Demonstrated.

Defendant's final claim of ineffective assistance is against Attorney Tancredi Calabrese, who represented Defendant during his direct appeal. Attorney Calabrese timely filed Defendant's appeal. Attorney Calabrese also timely filed Defendant's Pa. R.A.P. 1 925(b) statement identifying the issue raised on appeal, ("Whether the evidence at trial sufficiently established that the Defendant committed aggravated indecent assault less than 16 years of age and endangering the welfare of a child?"), but the statement did not specifically address which elements of the two crimes were not sufficiently established. *See* Def.'s Concise Statement, June 8, 2016. This Court identified counsel's failure to specify

25

which elements were not established by the evidence in its Opinion Pursuant to Pa. R.A.P. 1925(a), filed on June 21, 2016. Additionally, this Court identified the elements of both Aggravated Indecent Assault and Endangering the Welfare of a Child, and thoroughly analyzed whether the evidence presented at trial was sufficient to establish each of those elements. In the 1925(a) opinion, this Court determined that each element of each crime that Defendant was convicted of was sufficiently established beyond a reasonable doubt. *See* Op. Pursuant Pa. R.A.P. 1925(a), June 21, 2016.

The Superior Court considered Defendant's appeal, and on December 6, 2016, the Superior Court held that "[a]fter a thorough review of the record, the briefs of the parties, the applicable law ... we conclude that [Defendant]'s issue on appeal merits no relief." *Commonwealth v. Richter,* No. 755 WDA 2016 (Pa. Super. Ct. Dec. 2, 2016). The Superior Court squarely based its decision to affirm and uphold Defendant's conviction and sentence on the reasoning detailed in the trial court's Opinion Pursuant to Pa. R.A.P. 1925(a). *Id*

Defendant alleges that Attorney Calabrese's failure to specifically identify the elements not sufficiently established by the evidence at trial warrants the reinstatement of his direct appeal rights. Br. Supp. Def.'s PCRA Pet. 14-18. Defendant's claim is based on a family of case law that discusses the effect of a failure to file an appeal or the failure to timely file a Pa. R.A.P. 1925(b) statement, as well as circumstances that support automatic reinstatement of a criminal defendant's appeal rights when the failure of counsel resulted in the complete waiver of an appeal. *See Commonwealth v. Lord,* 719 A.2d 306, 309 (Pa. 1998); *Commonwealth v. Butler,* 812 A.2d 631, 635 (Pa. 2002); *Commonwealth v. Halley,* 870 A.2d 795, 801 (Pa. 2005); *Commonwealth v. West,* 883 A.2d 654, 657 (Pa. Super. Ct. 2005); *Commonwealth v. Castillo,* 888 A.2d 775, 779♦80 (Pa. 2005); *Commonwealth v. Schofield,*

26

888 A.2d 771, 773–75 (Pa. 2005). We agree with PCRA counsel that when counsel's error results in the waiver of a criminal defendant's right to an appeal, reinstatement of appeal rights under the PCRA is warranted. However, we find that in this case, Defendant's right to an appeal was not waived or foreclosed, as both this Court and the Superior Court analyzed and considered the merits of Defendant's appeal and ultimately determined that no relief was warranted. Further, the error of counsel in this case did not entirely deprive Defendant of his right to an appeal [12], and therefore, in order to be successful under the PCRA, Defendant has the burden to demonstrate that his claim warrants relief under *Pierce*. Defendant has failed to demonstrate prejudice resulting from counsel's missteps, and therefore Defendant's request for the reinstatement of appeal rights is denied.

"[A]n accused who is deprived entirely of his right of direct appeal by counsel's failure to perfect an appeal is per se without the effective assistance of counsel, and is entitled to reinstatement of his direct appellate rights." *Commonwealth v. Grosella*, 902 A.2d 1290, 1293 (Pa. Super. Ct. 2006) (quoting *Commonwealth v. Johnson*, 889 A.2d 620, 622 (Pa. Super. Ct. 2005)). There are very few circumstances where counsel's conduct warrants a presumption of prejudice and the reinstatement of a petitioner's direct appeal rights *nunc pro tune. Commonwealth v. Reed*, 971 A.2d 1216, 1225 (Pa. 2009). These circumstances include: (1) where counsel failed to file a requested direct appeal; (2) where counsel failed to file a concise statement of errors claimed of on appeal; or (3) where counsel failed to file a requested petition for allowance of appeal. *Id.* "In those extreme circumstances, where counsel has effectively abandoned his ... client and cannot possibly be acting in the client's best interests, our Supreme Court has held that the risk should fall on counsel, and not the

---

[12] Both the trial court and the Pennsylvania Superior Court analyzed whether the evidence presented at trial was sufficient to establish beyond a reasonable doubt each of the elements of the crimes of which Defendant was charged.

27

client." *Commonwealth v. West,* 883 A.2d 654, ◊58 (Pa. Super. Ct. 2005).

However, "the reinstatement of direct appeal rights is not the proper remedy when appellate counsel perfected a direct appeal but simply failed to raise certain claims." *Grosella,* 902 A.2d at 1293. The Superior Court explained:

> Where. a petitioner was not entirely denied his right to a direct appeal and only some of the issues the petitioner wished to pursue were waived, the reinstatement of the petitioner's direct appeal rights is not a proper remedy. In such circumstances, the [petitioner] must proceed under the auspices of the PCRA, and the P'CRA court should apply the traditional three-prong test for determining whether appellate counsel was ineffective.

*Id.* at 1293–94 (emphasis in original) (internal citations and footnotes omitted); *see also Commonwealth v. Reaves,* 923 A.2d 1119 (Pa. 2007) (in *Reaves,* the Pennsylvania Supreme Court held that counsel's failure to preserve a challenge to the sentence did not entirely foreclose appellate review of defendant's potential issues for direct appeal; the Superior Court addressed the merits of one of defendant's claims but waived the excessive sentence claim for failure to preserve it, and the Supreme Court found that counsel's error did not deprive defendant of his right to appellate review, but rather narrowed the ambit of issues for direct appeal, and consequently, defendant was required to satisfy the traditional three-prong ineffectiveness test to prevail under the PCRA).

In *Commonwealth v. Reed,* the Pennsylvania Supreme Court held that the filing of a deficient appellate brief does not constitute a complete denial of counsel so as to warrant a presumption of prejudice in the context of an ineffective assistance of counsel claim. 971 A.2d 1216, 1226–27 (Pa. 2009). The Supreme Court discussed the different circumstances where prejudice should be presumed due to ineffective assistance through the appeal process, but stressed that prejudice may only be presumed where counsel's errors completely deprive

28

a defendant of the constitutional right to appeal. *Id* However, where defendant was able to pursue a.ll appeal, but defendant claims counsel was nevertheless ineffective during the appeal process, defendant is required to establish actual prejudice under *Pierce's* three-prong test. *Id*

The cases on which Defendant relies concern circumstances where the errors of counsel completely foreclosed the defendant's ability to pursue a direct appeal. *See, e.g., Commonwealth v. Halley,* 870 A.2d 795; 801 (Pa. 2005); *Commonwealth v. West,* 883 A.2d 654, 657 (Pa. Super. Ct. 2005); *Commonwealth v. Castillo,* 888 A.2d 775, 779–80 (Pa. 2005). Defendant's brief states, "By failing to file a complete Pa. R.A.P. 1925 statement, Counsel Calabrese effectively did not file one at all." Br. Supp. Def.is PCRA Pet. 17.

However, Defendant's assertions in this respect fail to consider the factual differences between the cases Defendant cites and the circumstances in the instant case. Additionally, the case law clearly indicates that there is a distinction between cases where a defendant's right to appellate review is completely foreclosed and cases where certain issues are waived due to a non-compliant 1925 statement or other errors, but the appeal is otherwise considered. Since the merits of Defendant's appeal were considered, both by this Court and the Superior Court, Defendant's right to an appeal was honored and appellate review in fact occurred.

Pursuant to the PCRA and *Reed,* no prejudice is presumed in this case, and thus in order to prevail on an ineffectiveness claim against appellate counsel Defendant must demonstrate that the underlying claim has arguable merit, that no reasonable basis existed for counsel's actions or failure to act, and that Defendant suffered prejudice as a result of counsel's error such that there is a reasonable probability that Defendant's appeal would have been successful. *See Weiss,* 81 A.3d at 782. Here, Defendant has failed to demonstrate any

29

prejudice as a result of Attorney Calabrese's errors, nor has Defendant proven that but for counsel's errors Defendant's appeal would have been successful, and therefore no relief is warranted.

Defendant has not indicated how his appeal was prejudiced by the actions of Attorney Calabrese. There is nothing in the record to indicate that any meritorious claims could have been raised on appeal but were not. The issue that was raised on appeal was fully analyzed by this Court and the Superior Court, with both Courts concluding that Defendant's appeal was without merit. Defendant's argument that the incomplete 1925 statement is effectively no statement at all is not supportable, since the appeal was, in fact, considered on its merits. No additional arguments were presented as to how the actions of Attorney Calabrese prejudiced Defendant. There is nothing in the record to indicate that had some other strategy been pursued, Defendant's direct appeal would have been successful. Defendant has failed to establish prejudice as required under *Pierce* and *Strickland,* and as a result, Defendant's claim of ineffective assistance of Attorney Calabrese fails.

## CONCLUSION

Defendant's various claims of ineffective assistance of counsel all lack merit and must be dismissed. The first claim concerning Attorney Salisbury and Attorney Gerson's alleged failure to raise a conflict of interest fails as the claim that there was a conflict of interest does not have arguable merit. The claim that Attorney Gerson was ineffective at trial for failing to impeach the victim with prior inconsistent statements and prior accusations, and for failing to call a key witness, do not warrant relief as Defendant has failed to demonstrate how counsel's alleged errors prejudiced his defense at trial. Furthermore, Defendant did not

30

prove that Attorney Gerson's representatioll was objectively unreasonable. Finally, Defendant failed to demonstrate how the incomplete 1925 statement filed by Attorney Calabrese prejudiced his appeal, or that his appeal was not considered on its merits.

For the foregoing reasons, Defendant's PCRA petition is dismissed.

Accordingly, we enter the following order:

31

| | | |
|---|---|---|
| COMMONWEALTH | ) | IN THE COURT OF CO:rvr:MON PLEAS |
| | ) | OF SO:MERSET COUNTY, |
| | ) | PENNSYLVANIA |
| v. | ) | |
| | ) | |
| | ) | NO. 476 CRIMINAL 2013 |
| HENRY B. RJCHTER | ) | |
| | ) | |
| | ) | |
| Petitioner/Defendant. | ) | POST-CONVICTION RELIEF |

## ORDER

AND NOW, this 21st day of December, 2017, upon review of Defendant's PCRA Petition, argument at the evidentiary hearing, Defendant's supporting brief, the entire record of this case, and the applicable law, and in accordance with the foregoing Memorandum, we find that Defendant has failed to prove ineffective assistance of counsel. Defendant's Post-Conviction Collateral Relief Act Petition is therefore DISMISSED.

The Clerk of Courts shall serve a copy of this Order on Defendant's PCRA counsel and the Somerset County District Attorney.

BY THE COURT:

_____
SC0TT P. BITTNER, J.

Distribution:  Lisa Lazzari-Strasiser, Esq. - Somerset County District Attorney
Joseph V. Luvara, Esq. – PCRA Counsel for Defendant

3